**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**Atlanta Division**

| | |
|---|---|
| CHELSEA CANTU and JAYNE PARKS, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br>v.<br><br>ERMI, LLC,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

## CLASS ACTION COMPLAINT

Plaintiffs Chelsea Cantu and Jayne Parks ("Plaintiffs"), individually and on behalf of all others similarly situated, upon personal knowledge of facts pertaining to them, upon information and belief as to all other matters, and by and through undersigned counsel, hereby bring this Class Action Complaint against Defendant ERMI, LLC ("ERMI" or "Defendant"), and allege as follows:

## INTRODUCTION

1. Plaintiffs bring this action on behalf of themselves and all other individuals similarly situated ("Class Members") against ERMI for its failure to secure and safeguard the personally identifiable information ("PII") and protected health information ("PHI") (collectively, the "Private Information") of Plaintiffs and Class Members.

2. Defendant ERMI is a medical device company with a principal place of business in Georgia that partners with healthcare professionals to provide patients with home-based rehabilitative devices and programs designed to restore joint mobility following surgery.[1] In the ordinary course of its business, ERMI collects, stores, and maintains individuals' PII and PHI, and

[1] ERMI, *About U*s https://www.ermi-motion.com/about-us/ (last visited June 4, 2026).

is required to implement reasonable safeguards to protect such information from unauthorized access and disclosure.

3. On or about July 25, 2025, Defendant learned that an unauthorized actor may have gained access to a limited number of its employee email accounts. Defendant's subsequent investigation determined that an unauthorized actor accessed, and may have removed, files within Defendant's systems between approximately February 15, 2025, and August 14, 2025. On or about April 17, 2026, Defendant determined that those files may have contained the Private Information of Plaintiffs and Class Members.

4. On or about May 26, 2026, Defendant began mailing notice letters to affected individuals—more than fifteen months after the unauthorized access began and roughly ten months after Defendant first discovered the incident.

5. According to Defendant's own notice of the Data Breach, the categories of Private Information involved in the incident included, depending on the individual, name, Social Security number, driver's license number, financial account information, payment card information, date of birth, medical and diagnostic information, medical record number, patient number, dates of service, and health insurance information.

6. Plaintiffs and Class Members entrusted their Private Information to Defendant, directly or indirectly, with the reasonable expectation and mutual understanding that Defendant would safeguard it and use reasonable measures to protect it from unauthorized access and disclosure. Defendant failed to do so.

7. As a direct and proximate result of Defendant's failure to implement and maintain reasonable data security, Plaintiffs and Class Members have suffered injury, including the loss of control over their Private Information, the present and continuing risk of identity theft and fraud,

lost time responding to the Data Breach, diminution in the value of their Private Information, loss of privacy, and the costs of mitigation, and remain at heightened risk of harm for years to come.

8. Plaintiffs bring this action on behalf of themselves and all others similarly situated to recover damages and to obtain equitable relief, including injunctive and declaratory relief, requiring Defendant to adopt and maintain reasonable data-security measures, to provide adequate notice and identity-monitoring services, and to compensate Plaintiffs and Class Members for the harm caused by the Data Breach.

## THE PARTIES

9. Plaintiff Chelsea Cantu is a citizen of California domiciled in San Diego, California, who provided her Private Information to Defendant in connection with the medical services and devices Defendant provided. Plaintiff Cantu received a notice letter from Defendant dated May 26, 2026, informing her that her Private Information was involved in the Data Breach. According to that letter, the Private Information involving Plaintiff Cantu included her full name, diagnostic treatment information, medical record number, medical date(s) of service, and patient number.

10. Plaintiff Jayne Parks is a citizen of South Carolina domiciled in Duncan, South Carolina, who provided her Private Information to Defendant in connection with the medical services and devices Defendant provided. Plaintiff Parks received a notice letter from Defendant dated May 26, 2026, informing her that her Private Information was involved in the Data Breach. According to that letter, the Private Information involving Plaintiff Parks included her full name, date of birth, diagnostic treatment information, medical record number, medical date(s) of service, patient number, and provider name.

11. Defendant ERMI, LLC is a limited liability company with a principal place of business located in Atlanta, Georgia.

## JURISDICTION AND VENUE

12. This Court has subject-matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the amount in controversy exceeds $5,000,000 exclusive of interest and costs, the proposed Class consists of more than 100 members, and at least one Class Member is a citizen of a state different from Defendant, satisfying minimal diversity. Plaintiff Cantu is a citizen of California, and Plaintiff Parks is a citizen of South Carolina, each of whom is diverse from Defendant.

13. This Court has personal jurisdiction over Defendant because Defendant's principal place of business is located in this District, Defendant is at home in Georgia, and the acts and omissions giving rise to Plaintiffs' claims occurred in substantial part in this District.

14. Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant resides in this District and because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District.

## GENERAL ALLEGATIONS

15. Defendant is a provider of medical devices and rehabilitative programs that partners with physicians, physical therapists, and other healthcare professionals to offer devices and programs that patients use at home to regain joint mobility, including after surgery.

16. To provide its services, Defendant solicits, collects, receives, stores, and maintains the Private Information of its patients, including Plaintiffs and Class Members. Plaintiffs and Class Members are current and former patients of Defendant.

17. Defendant derives a financial benefit from the Private Information it collects and could not conduct its regular business without collecting and maintaining information it knows to be sensitive and confidential. Class Members, directly or indirectly, paid Defendant or their healthcare providers for services, and a portion of that payment was understood to fund the

reasonable protection of their Private Information.

18. Defendant acknowledged its obligation to safeguard patient information. Defendant's publicly posted Privacy Policy represents that Defendant respects patient privacy and is committed to protecting it, and acknowledges that Defendant is obligated to protect the privacy of the protected health information it receives or creates.

19. By soliciting, collecting, and storing Plaintiffs' and Class Members' Private Information for its own benefit, Defendant assumed a duty to exercise reasonable care to protect that information from unauthorized access and disclosure, and knew or should have known that it bore responsibility for doing so.

**A. The Data Breach**

20. According to a data breach notification ("Breach Notice") posted on ERMI's website, unauthorized access to its network systems occurred between February 15, 2025, and August 14, 2025. During this period, an unauthorized third party accessed files on ERMI's network containing PII and PHI, including full name, diagnostic treatment information, medical record number, medical date(s) of service, and patient number.

21. On April 17, 2026, following an investigation, ERMI determined that certain files containing sensitive personal information stored on its systems were involved in a data breach.

22. However, Defendant did not begin notifying affected individuals until May 26, 2026, when it first informed them that their personal information may have been compromised in the Data Breach, more than fifteen months after the unauthorized access began and about ten months after Defendant first discovered the incident.

23. The Breach Notice did not specify detailed measures or actions ERMI took to fully remediate the vulnerabilities that led to the Data Breach, nor did it explain the specific measures adopted to prevent future incidents.

**B. Defendant's Data Security Obligations and the Applicable Standard of Care.**

24. As a medical device company that creates, receives, maintains, or transmits protected health information in connection with the rehabilitative devices and programs it provides to patients and the physicians, physical therapists, and other healthcare professionals with whom it partners, Defendant is a business associate within the meaning of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 42 U.S.C. §§ 1320d et seq., and the regulations promulgated thereunder, including the HIPAA Security Rule, 45 C.F.R. Part 164, Subpart C, which applies to covered entities and their business associates alike. Although HIPAA does not provide a private cause of action, the HIPAA Privacy Rule and Security Rule establish the duty-of-care framework that informs the reasonable-security obligations of entities, like Defendant, that handle protected health information.

25. The HIPAA Security Rule requires covered entities and their business associates, among other things, to: (a) ensure the confidentiality, integrity, and availability of all electronic protected health information that the covered entity creates, receives, maintains, or transmits, 45 C.F.R. § 164.306(a)(1); (b) protect against any reasonably anticipated threats or hazards to the security or integrity of such information, *id.* § 164.306(a)(2); (c) protect against any reasonably anticipated uses or disclosures of such information that are not permitted, *id.* § 164.306(a)(3); and (d) implement administrative, physical, and technical safeguards reasonably designed to protect the confidentiality, integrity, and availability of such information, *id.* §§ 164.308, 164.310, 164.312.

26. In addition to the duty-of-care framework provided by HIPAA, Defendant's data-security obligations are informed by widely recognized federal and industry guidance. The Federal Trade Commission has long advised businesses that reasonable data security includes building security into operations from the outset, employing access controls and strong authentication,

conducting network monitoring and segmentation, providing secure remote access, applying timely patches, and implementing secure development practices.[2] The FTC has further explained that reasonable security includes inventorying stored personal information, securely disposing of unneeded data, encrypting sensitive information, understanding system vulnerabilities, and planning ahead for breaches.[3]

27. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business,* which established guidelines for fundamental data security principles for business.[4] Among other things, the guidelines note that businesses should properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to address security issues. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[5]

28. Additionally, the FTC recommends that companies limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[6]

---

[2] *See* Fed. Trade Comm'n, *Start with Security: A Guide for Business* (June 2015), https://www.ftc.gov/business-guidance/resources/start-security-guide-business.
[3] *See* Fed. Trade Comm'n, *Protecting Personal Information: A Guide for Business* (Oct. 2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.
[4] *See* FEDERAL TRADE COMMISSION, *Protecting Personal Information: A Guide for Business* (Oct. 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_protecting-personal-information.pdf.
[5] *Id.*
[6] *Id.*

29. Highlighting the importance of protecting against phishing and other types of data breaches, the FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect PII/PHI, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

30. The National Institute of Standards and Technology ("NIST") has published a comprehensive catalog of security and privacy controls that establishes objective benchmarks for reasonable security, including controls for access management, incident response, risk assessment, audit logging, authentication, and vendor management.[7] NIST has further published current best-practice guidance on incident response that aligns with the NIST Cybersecurity Framework 2.0.[8]

31. The Center for Internet Security has published the CIS Critical Security Controls, a prioritized and actionable set of safeguards that maps to NIST and other authoritative frameworks and represents the consensus industry best practice for reasonable security.[9]

32. The U.S. Department of Health and Human Services, through its 405(d) Program, has published cybersecurity guidance specifically addressed to the healthcare sector, identifying practical safeguards that healthcare organizations are expected to implement to address the sector's most significant threats, including email protection, endpoint protection, access management, data

---

[7] *See* Joint Task Force, Nat'l Inst. of Standards & Tech., *Security and Privacy Controls for Information Systems and Organizations*, NIST Special Publication 800-53, Rev. 5 (Sept. 2020), https://doi.org/10.6028/NIST.SP.800-53r5.
[8] *See* Nat'l Inst. of Standards & Tech., *Incident Response Recommendations and Considerations for Cybersecurity Risk Management: A CSF 2.0 Community Profile*, NIST Special Publication 800-61, Rev. 3 (Apr. 2025), https://csrc.nist.gov/pubs/sp/800/61/r3/final.
[9] *See* Ctr. for Internet Sec., *CIS Critical Security Controls* (v8.1) (2024/2025), https://www.cisecurity.org/controls/v8-1.

protection, vulnerability management, and incident response.[10] HHS has also published Healthcare and Public Health Sector-Specific Cybersecurity Performance Goals, which identify foundational practices the healthcare sector should prioritize, including vulnerability mitigation, email security, multi-factor authentication, encryption, credential management, and incident planning.[11]

33. The Office for Civil Rights of the Department of Health and Human Services ("OCR") has long published security guidance for covered entities and business associates, confirming that the basic safeguards and cyber preparedness obligations applicable to Defendant are longstanding regulatory expectations rather than novel or emerging duties.[12]

34. The Cybersecurity and Infrastructure Security Agency ("CISA"), in conjunction with the Multi-State Information Sharing and Analysis Center, has published the #StopRansomware Guide, which prescribes basic, well-established measures that organizations—including healthcare providers — are expected to implement to mitigate the threat of ransomware and similar intrusions, including phishing-resistant multi-factor authentication, prompt installation of operating-system and software updates, and ongoing user training.[13]

35. By collecting, using, and storing Plaintiffs' and Class Members' Private Information for its commercial benefit, Defendant assumed a duty to implement and maintain reasonable security measures consistent with applicable federal and industry standards. Defendant's duty included, but was not limited to, encrypting Private Information at rest and in

[10] *See* U.S. Dep't of Health & Human Servs., 405(d) Program, *Health Industry Cybersecurity Practices: Managing Threats and Protecting Patients* (2023 ed.), https://405d.hhs.gov/Documents/HICP-Main-508.pdf.
[11] *See* U.S. Dep't of Health & Human Servs., *Healthcare and Public Health Sector-Specific Cybersecurity Performance Goals* (2024), https://hhscyber.hhs.gov/documents/cybersecurity-performance-goals.pdf.
[12] *See* U.S. Dep't of Health & Human Servs., Off. for Civil Rights, *Security Rule Guidance Material*, https://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html.
[13] *See* Cybersecurity & Infrastructure Sec. Agency & Multi-State Info. Sharing & Analysis Ctr., *#StopRansomware Guide* (updated Mar. 2025).

transit, implementing multi-factor authentication, deploying logging and monitoring systems sufficient to detect intrusions, maintaining current operating systems and software patches, training its workforce on data security and phishing risks, and implementing reasonable policies and procedures to detect, respond to, and contain security incidents.

**C. The Data Breach was Preventable**

36. The Data Breach was eminently foreseeable. The healthcare sector has long been a leading target of cyberattacks, and Defendant knew, or, in the exercise of reasonable care, should have known, that its network and the Private Information stored on it were likely targets of cybercriminals.

37. Federal regulators have repeatedly warned the healthcare sector about the foreseeable risk of cyberattacks. The HHS 405(d) Program and HHS's Healthcare and Public Health Sector-Specific Cybersecurity Performance Goals were promulgated specifically because cyberattacks against healthcare entities were known to be common, foreseeable, and devastating to patients.[14] CISA has likewise issued ongoing public guidance for the healthcare sector regarding cyberattacks and other intrusions affecting the sector.[15]

38. Numerous publicly reported cyberattacks against healthcare providers in the years preceding the Data Breach put Defendant on notice of the foreseeability of the Data Breach and of the categories of Private Information likely to be targeted. Healthcare providers have repeatedly been the subject of high-profile cyberattacks resulting in the compromise of patient PII and PHI in volumes ranging from tens of thousands to tens of millions of records. The healthcare sector's sustained position as one of the most-targeted sectors for cyberattacks is well documented.[16]

---

[14] *See* supra note 16.
[15] *See* supra note 13.
[16] *See* Identity Theft Resource Ctr., 2025 Annual Data Breach Report (Jan. 2026), https://www.idtheftcenter.org/wp-content/uploads/2026/01/2025-ITRC-Annual-Data-Breach-

39. Had ERMI maintained industry-standard safeguards to monitor, assess, and update security controls and related system risks, it could have safeguarded patient data. ERMI's lack of security controls and the delayed implementation of enhanced security measures only after the Data Breach are inexcusable.

40. ERMI was at all times fully aware of its obligation to protect patients' PII/PHI and the risks associated with failing to do so. ERMI knew that information of the type it collects, maintains, and stores is highly coveted and a frequent target of hackers.

41. This exposure, along with the fact that the compromised PII/PHI is already likely being sold on the dark web, is tremendously problematic. Cybercrime is rising at an alarming rate, as shown in the FBI's Internet Crime Complaint Center statistics.




42. By 2013, it was being reported that nearly one out of four data breach notification recipients became a victim of identity fraud.[17]

Report.pdf (healthcare sector ranked second-most targeted industry with 534 compromises in 2025, behind only financial services (739); it had been the single most-targeted sector each year from 2018 through 2023 and remained among the top two in both 2024 and 2025).

[17] Al Pascual, *2013 Identity Fraud Report: Data Breaches Becoming a Treasure Trove for Fraudsters*, JAVELIN (Feb. 20, 2013), https://javelinstrategy.com/research/2013-identity-fraud-report-data-breaches-becoming-treasure-trove-fraudsters (last visited June 4, 2026).

43. Stolen PII/PHI is often trafficked on the dark web, as is the case here. Law enforcement has difficulty policing the dark web due to this encryption, which allows users and criminals to conceal identities and online activity.

44. When malicious actors infiltrate companies and copy and exfiltrate the PII/PHI that those companies store, that stolen information often ends up on the dark web because the malicious actors buy and sell that information for profit.[18]

45. Another example is when the U.S. Department of Justice announced its seizure of AlphaBay in 2017. AlphaBay had more than 350,000 listings, many of which concerned stolen and fraudulent documents that could be used to assume another person's identity. Other marketplaces, similar to the now-defunct AlphaBay, are awash with [PII/PHI] belonging to victims from countries all over the world. One of the key challenges of protecting PII/PHI online is its pervasiveness. "As data breaches in the news continue to show, PII/PHI about employees, patients, and the public is housed in all kinds of organizations, and the increasing digital transformation of today's businesses only broadens the number of potential sources for hackers to target."[19]

46. The PII/PHI of consumers remains highly valuable to criminals, as evidenced by the prices they pay on the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[20] Experian reports that a stolen credit or debit card

---

[18] *Shining a Light on the Dark Web with Identity Monitoring*, IDENTITYFORCE (Feb. 1, 2020), https://www.identityforce.com/blog/shining-light-dark-web-identity-monitoring.

[19] *Stolen PII/PHI & Ramifications: Identity Theft and Fraud on the Dark Web*, ARMOR (April 3, 2018), https://web.archive.org/web/20210614051146/https://www.armor.com/resources/blog/stolen-PII/PHIramifications-identity-theft-fraud-dark-web/.

[20] Anita George, *Your personal data is for sale on the dark web. Here's how much it costs,* DIGITAL TRENDS (Oct. 16, 2019), https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

number can sell for $5 to $110 on the dark web.[21] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[22]

47. Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number assuming your identity can cause a lot of problems.[23]

48. What is more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventative action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraudulent activity to obtain a new number.

49. Even then, a new Social Security number may not be effective. According to Julie Fergerson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the

---

[21] Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/?msockid=2bcba6b07db36c323b77b0a17cc26db2.

[22] *In the Dark*, VPNOVERVIEW, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited June 4, 2026).

[23] *Identity Theft and Your Social Security Number*, SOCIAL SECURITY ADMINISTRATION, Pub. No. 05-10064 (Oct. 2024), https://www.ssa.gov/pubs/EN-05-10064.pdf.

new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[24]

50. Because of this, the information comprised in the Data Breach here is significantly more harmful to lose than, for example, credit card information in a retailer payment card breach, because victims can simply cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

51. The PII/PHI compromised by the Data Breach demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10 times on the black market."[25]

52. Once PII/PHI is sold, it is often used to gain access to various areas of the victim's digital life, including bank accounts, social media, credit cards, and tax details. This can lead to additional PII/PHI being harvested from the victim, as well as PII/PHI from family, friends, and colleagues of the original victim.

53. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses in 2019, resulting in more than $3.5 billion in losses to individuals and business victims.

54. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts

[24] Brian Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), https://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft.
[25] Tim Greene, *Anthem hack: Personal data stolen sells for 10x price of stolen credit card numbers*, NETWORK WORLD (Feb. 6, 2015), https://www.networkworld.com/article/935334/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

or misuse of existing accounts.

55. Data breaches facilitate identity theft, as hackers obtain consumers' PII/PHI and use it to siphon money from existing accounts, open new accounts in their victims' names, or sell consumers' PII/PHI to others who do the same.

56. For example, the United States Government Accountability Office noted in a June 2007 report on data breaches (the "GAO Report") that criminals use PII/PHI to open financial accounts, receive government benefits, and make purchases and secure credit in a victim's name.[26] The GAO Report further notes that this type of identity fraud is the most harmful because it may take some time for a victim to become aware of the fraud, and can adversely impact the victim's credit rating in the meantime. The GAO Report also states that identity theft victims will face "substantial costs and inconveniences repairing damage to their credit records . . . [and their] good name."[27]

57. The exposure of Plaintiffs' and Class Members' PII/PHI to cybercriminals will continue to cause substantial risk of future harm, including identity theft, that is continuing and imminent in light of the many different avenues of fraud and identity theft utilized by third-party cybercriminals to profit off this highly sensitive information.

**D. The Impact of Data Breach on Victims**

58. ERMI's failure to keep Plaintiffs' and Class Members' PII/PHI secure has severe ramifications. Given the highly sensitive nature of the PII/PHI stolen in the Data Breach, Social Security numbers, first and last names, dates of birth, and medical information, hackers can commit identity theft, financial fraud, and other identity-related fraud against Plaintiffs and Class

---

[26] *See* GOVERNMENT ACCOUNTABILITY OFFICE, *Personal Information: Data Breaches are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown*, GAO-07-737 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf.
[27] *Id.*

Members now and into the indefinite future. As a result, Plaintiffs have suffered injury and face an imminent and substantial risk of further injury, including identity theft and related cybercrimes, due to the Data Breach.

59. The PII/PHI exposed in the Data Breach is highly coveted and valuable on underground markets. Identity thieves can use the PII/PHI to: (a) commit insurance fraud; (b) obtain a fraudulent driver's license or ID card in the victim's name; (c) obtain fraudulent government benefits; (d) file a fraudulent tax return using the victim's information; (e) commit medical and healthcare-related fraud; (f) access financial and investment accounts and records; (g) engage in mortgage fraud; and/or (h) commit any number of other frauds, such as obtaining a job, procuring housing, or giving false information to police during an arrest.

60. Further, malicious actors often wait months or years to use the PII/PHI obtained in data breaches, as victims often become complacent and less diligent in monitoring their accounts after a significant period has passed. These bad actors will also reuse stolen PII/PHI, meaning individuals can be victims of several cybercrimes stemming from a single data breach.

61. Given the unauthorized access to, and alleged exfiltration of, patient PII/PHI from ERMI, many victims of the Data Breach have likely already suffered significant harms, including, but not limited to, identity theft and fraud. Plaintiffs and Class Members have also spent time, money, and effort dealing with the fallout of the Data Breach, including purchasing credit monitoring services, reviewing financial and insurance statements, checking credit reports, and spending time and effort searching for unauthorized activity.

62. It is no wonder, then, that identity theft exacts a severe emotional toll on its victims. The 2021 Identity Theft Resource Center survey evidences the emotional suffering experienced by victims of identity theft:

- 84% reported anxiety;
- 76% felt violated;
- 32% experienced financial-related identity problems;
- 83% reported being turned down for credit or loans;
- 32% reported problems with family members as a result of the breach;
- 10% reported feeling suicidal.[28]

63. Identity theft can also exact a physical toll on its victims. The same survey reported that respondents experienced physical symptoms stemming from their experience with identity theft:

- 48% reported sleep disturbances;
- 37.1% reported an inability to concentrate/lack of focus;
- 28.7% reported they were unable to go to work because of physical symptoms;
- 23.1 reported new physical illnesses (aches and pains, heart palpitations, sweating, stomach issues); and
- 12.6% reported a start or relapse into unhealthy or addictive behaviors.[29]

64. Annual monetary losses from identity theft are in the billions of dollars. According to a Presidential Report on identity theft produced in 2007:

> In addition to the losses that result when identity thieves fraudulently open accounts . . . individual victims often suffer indirect financial costs, including the costs incurred in both civil litigation initiated by creditors and in overcoming the many obstacles they face in obtaining or retaining credit. Victims of non-financial identity theft, for example, health-related or criminal record fraud, face other types of harm and frustration.

---

[28] IDENTITY THEFT RESOURCE CENTER, *2021 Consumer Aftermath Report: How Identity Crimes Impact Victims, their Families, Friends, and Workplaces* (2021), https://www.idtheftcenter.org/wp-content/uploads/2021/09/ITRC_2021_Consumer_Aftermath_Report.pdf.
[29] *Id.*

> In addition to out-of-pocket expenses that can reach thousands of dollars for the victims of new account identity theft, and the emotional toll identity theft can take, some victims have to spend what can be a considerable amount of time to repair the damage caused by the identity thieves. Victims of new account identity theft, for example, must correct fraudulent information in their credit reports and monitor their reports for future inaccuracies, close existing bank accounts and open new ones, and dispute charges with individual creditors.

65. The unauthorized disclosure of sensitive PII/PHI to data thieves also reduces its inherent value to its owner, a harm recognized by courts as an independent form of harm.[30]

66. Consumers are injured every time their data is stolen and traded on underground markets, even if they have been victims of previous data breaches. Indeed, the dark web comprises multiple discrete repositories of stolen information that can be aggregated or accessed by different criminal actors who intend to use it for various fraudulent purposes. Each data breach increases the likelihood that a victim's personal information will be exposed to more individuals who seek to misuse it at the victim's expense.

67. As a result of the wide variety of injuries that can be traced to the Data Breach, Plaintiffs and Class Members have and will continue to suffer economic loss and other actual harm for which they are entitled to damages, including, but not limited to, the following:

a. The unconsented disclosure of confidential information to a third party;

b. Unauthorized use of their PII/PHI without compensation;

c. Losing the value of the explicit and implicit promises of data security;

d. Losing the value of access to their PII/PHI permitted by ERMI without their permission;

e. Identity theft and fraud resulting from the theft of their PII/PHI;

---

[30] *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—that the value that personal identifying information has in our increasingly digital economy. Many companies, like Marriott, collect personal information. Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

f. Costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;

g. Anxiety, emotional distress, and loss of privacy;

h. The present value of ongoing credit monitoring and identity theft protection services necessitated by the Data Breach;

i. Unauthorized charges and loss of use of and access to their accounts;

j. Lowered credit scores resulting from credit inquiries following fraudulent activities;

k. Costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including searching for fraudulent activity, imposing withdrawal and purchase limits on compromised accounts, and the stress, nuisance, and annoyance of dealing with the repercussions of the Data Breach; and

l. The continued, imminent, and certainly impending injury flowing from potential fraud and identity theft posed by their PII/PHI being in the possession of one or more unauthorized third parties.

68. Even in instances where an individual is reimbursed for a financial loss due to identity theft or fraud, that does not make the individual whole again, as seeking reimbursement typically requires significant time and effort. The Department of Justice's Bureau of Justice Statistics found that identity theft victims, "reported spending an average of about 7 hours clearing up the issues" relating to identity theft or fraud.[31]

69. Plaintiffs and Class Members place significant value in data security. According to a survey conducted by the cybersecurity company FireEye Mandiant, approximately 50% of consumers consider data security a main or important consideration when making purchasing decisions, and nearly the same percentage would be willing to pay more

---

[31] E. Harrell, *Victims of Identity Theft, 2014*, U.S. DEPARTMENT OF JUSTICE (Nov. 13, 2017), http://www.bjs.gov/content/pub/pdf/vit14.pdf.

to work with a provider with better data security. Seventy percent of consumers would provide less personal information to organizations that suffered a data breach.[32]

70. Plaintiffs and Class Members have a direct interest in ERMI's promises and duties to protect PII/PHI, i.e., that ERMI would *not increase* their risk of identity theft and fraud. Because ERMI failed to live up to its promises and duties in this respect, Plaintiffs and Class Members seek the present value of ongoing identity protection services to compensate them for the present harm and present and continuing increased risk of harm caused by ERMI's wrongful conduct. Through this remedy, Plaintiffs seek to restore themselves and Class Members as close to the same position as they would have occupied but for ERMI's wrongful conduct, namely its failure to adequately protect Plaintiffs' and the Class Members' PII/PHI.

71. Plaintiffs and Class Members further seek to recover the value of the unauthorized access to their PII/PHI permitted through ERMI's wrongful conduct. This measure of damages is analogous to the remedies for the unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's PII/PHI is non-rivalrous—the unauthorized use by another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology. Nevertheless, a Plaintiff may generally recover the reasonable use of the value of the IP—i.e., a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non-practicing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles, authorizing recovery of rental or use value. This measure is

---

[32] Richard Turner, *Beyond the Bottom Line: The Real Cost of Data Breaches*, FIREEYE (May 11, 2016), https://web.archive.org/web/20210422161745/https://www.fireeye.com/blog/executive-perspective/2016/05/beyond_the_bottomli.html.

appropriate because: (a) Plaintiffs and Class Members have a protectible property interest in their PII/PHI; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; (c) rental value is established with reference to market value, i.e., evidence regarding the value of similar transactions.

72. Plaintiffs and Class Members have an interest in ensuring that their PII/PHI is secure and not subject to further theft, as ERMI continues to hold it.

**E. Defendant Failed to Implement Reasonable Security Measures.**

73. Notwithstanding the foreseeable risk of a cyberattack and the well-established standards of care set forth above, Defendant failed to implement reasonable security measures sufficient to protect Plaintiffs' and Class Members' Private Information from unauthorized access.

74. The Data Breach itself is evidence that Defendant's data-security practices fell below the applicable standard of care. Upon information and belief, had Defendant implemented industry-standard measures—including, without limitation, encryption of stored Private Information, phishing-resistant multi-factor authentication, network segmentation, robust logging and monitoring systems, prompt patching of known vulnerabilities, secure backup procedures, and adequate workforce training — the unauthorized third party would have been detected and stopped before Private Information could be removed from Defendant's network.

75. Defendant's failure to detect the unauthorized access for some period of time and its lengthy delay in completing its investigation and notifying affected individuals further reflect deficient incident-response capabilities inconsistent with the standard of care.[33]

**F. Plaintiff Cantu's Experience**

76. Plaintiff Cantu is a current or former patient of Defendant who provided her Private

---

[33] NIST SP 800-61 Rev. 3 and the FTC's *Data Breach Response: A Guide for Business* (Aug. 2023) https://www.ftc.gov/business-guidance/resources/data-breach-response-guide-business.

Information, directly or indirectly, to Defendant in order to receive Defendant's services.

77. Plaintiff Cantu received a notice letter from Defendant dated May 26, 2026, informing her that her Private Information was involved in the Data Breach. The letter identified the Private Information involved as to Plaintiff Cantu as her full name, diagnostic treatment information, medical record number, medical date(s) of service, and patient number.

78. Plaintiff Cantu reasonably expected, and understood it to be mutually agreed, that Defendant would keep her Private Information confidential and secure. She values the privacy and security of her Private Information and does not disclose it freely.

79. Since the Data Breach, Plaintiff Cantu has experienced a marked increase in unsolicited spam telephone calls, which she attributes to the Data Breach based on their timing, the careful handling of her own information, and the atypical nature of the increase.

80. Plaintiff Cantu was notified by a credit-monitoring service that her personal information was found on the dark web, and she identified an unauthorized charge of approximately $100 on her credit card, which she discovered in or about March 2026. In response, she requested a replacement card and changed her account passwords. Plaintiff Cantu links this activity to the Data Breach due to its timing relative to the breach.

81. As a result of the Data Breach, Plaintiff Cantu has suffered injury, including (i) lost time and effort responding to the Data Breach and monitoring her accounts; (ii) the loss of control over and privacy in her Private Information; (iii) loss of the benefit of the bargain; (iv) anxiety and concern regarding the misuse of her Private Information; and (v) the continuing and heightened risk of identity theft and fraud. She will be required to monitor her accounts and credit for the foreseeable future.

**G. Plaintiff Parks's Experience**

82. Plaintiff Parks is a current or former patient of Defendant who provided her Private

Information, directly or indirectly, to Defendant in order to receive Defendant's services.

83. Plaintiff Parks received a notice letter from Defendant dated May 26, 2026, informing her that her Private Information was involved in the Data Breach. The letter identified the Private Information involved as to Plaintiff Parks as her full name, date of birth, diagnostic treatment information, medical record number, medical date(s) of service, patient number, and provider name.

84. Plaintiff Parks reasonably expected, and understood it to be mutually agreed, that Defendant would keep her Private Information confidential and secure. She values the privacy and security of her Private Information and does not disclose it freely.

85. Since the Data Breach, Plaintiff Parks has experienced a marked increase in unsolicited spam telephone calls and spam emails, which she attributes to the Data Breach based on their timing, the careful handling of her own information, and the atypical nature of the increase. In response to the Data Breach, Plaintiff Parks changed her passwords, contacted her bank, and placed a freeze on her credit.

86. As a result of the Data Breach, Plaintiff Parks has suffered injury, including (i) lost time and effort responding to the Data Breach, including contacting her bank and placing a credit freeze; (ii) the loss of control over and privacy in her Private Information; (iii) loss of the benefit of the bargain; (iv) anxiety and concern regarding the misuse of her Private Information; and (v) the continuing and heightened risk of identity theft and fraud.

**H. Injuries Suffered by Plaintiffs and the Class.**

87. As a direct and proximate result of the Data Breach, Plaintiffs and Class members have suffered, and will continue to suffer, injury and damages, including, but not limited to:

a) the unauthorized acquisition and disclosure of their Private Information by criminal third parties, and the corresponding loss of privacy and confidentiality in that information;

b) a substantial and certainly impending increased risk of identity theft, financial fraud, medical identity theft, and other forms of misuse of their Private Information — risks that justify and require ongoing expenditures for protective and remedial services;

c) lost time, lost productivity, and out-of-pocket expenses incurred to mitigate and remediate the consequences of the Data Breach, including the costs and effort associated with monitoring credit and financial accounts, placing and lifting fraud alerts and credit freezes, monitoring medical records and explanation-of-benefits statements, and obtaining identity theft and credit monitoring services;

d) the diminished value of their Private Information, for which there is a well-documented economic market;

e) anxiety, concern, and emotional distress arising from the loss of control over their Private Information and the ongoing risk of misuse of that information;

f) a marked increase in unsolicited telephone calls, electronic messages, and other communications consistent with the misuse of their Private Information;

g) the deprivation of the benefit of the bargain in their commercial relationship with Defendant, in that they paid Defendant (directly or through their insurers) for medical services, and a portion of that consideration was understood to be allocated to the protection of their Private Information — a service Defendant failed adequately to provide; and

h) the continuing risk to their Private Information, which on information and belief remains in Defendant's possession and continues to be subject to further unauthorized access in the absence of adequate remediation.

## CLASS ACTION ALLEGATIONS

88. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and the following proposed class (collectively, "the Class"), defined as follows:

> All persons residing in the United States whose Private Information was compromised in the Data Breach experienced by ERMI, LLC, including all who were sent a notice of the Data Breach.

89. Excluded from the proposed Class are any officer or director of ERMI; any officer or director of any affiliate, parent, or subsidiary of ERMI; anyone employed by counsel in this action; and any judge to whom this case is assigned, his or her spouse, and members of the judge's

staff.

90. **Numerosity.** Members of the proposed Class are likely to number in the thousands and are thus too numerous to practically join in a single action. Membership in the Class is readily ascertainable from ERMI's own records.

91. **Commonality and Predominance.** Common questions of law and fact exist as to the proposed Class Members and predominate over questions affecting only individual Class Members. These common questions include:

a. Whether ERMI engaged in the wrongful conduct alleged herein;

b. Whether ERMI's inadequate data security measures were a cause of the Data Breach;

c. Whether ERMI owed a legal duty to Plaintiffs and the other Class Members to exercise due care in collecting, storing, and safeguarding their PII/PHI;

d. Whether ERMI negligently or recklessly breached legal duties owed to Plaintiffs and the Class Members to exercise due care in collecting, storing, and safeguarding their PII/PHI;

e. whether an implied contract existed between Defendant and Class members that included an obligation to safeguard their Private Information;

f. whether Defendant breached that implied contract;

g. whether Defendant was unjustly enriched by retaining payments that were partially attributable to the safeguarding of Private Information that Defendant did not in fact safeguard;

h. whether Defendant's conduct caused injury to Plaintiffs and Class members and, if so, the appropriate measure of damages and other relief; and

i. whether Plaintiffs and Class members are entitled to declaratory and injunctive relief, including an order requiring Defendant to implement and maintain reasonable cybersecurity safeguards going forward.

92. ERMI engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs, individually, and on behalf of the other Class Members. Similar or identical statutory and common violations, business practices, and injuries are involved. Individual

questions, if any, pale in both quantity and quality by comparison to the numerous questions that dominate this action.

93. **Typicality:** Plaintiffs' claims are typical of the claims of the Members of the Class. All Class Members were subject to the Data Breach and had their PII/PHI accessed by and/or disclosed to unauthorized third parties. ERMI's misconduct affected all Class Members in the same manner.

94. **Adequacy of Representation:** Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the other Class Members they seek to represent; they have retained counsel competent and experienced in complex class action litigation, and Plaintiffs will prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

95. **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this matter as a class action. The damages, harm, or other financial detriment suffered individually by Plaintiffs and the other Class Members are relatively small compared to the burden and expense that would be required to litigate their claims on an individual basis against ERMI, making it impracticable for Class Members to individually seek redress for ERMI's wrongful conduct. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation would create a potential for inconsistent or contradictory judgments, increasing the delay and expense for all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (On Behalf of Plaintiffs and the Class)

96. Plaintiffs reallege paragraphs 1 through 95 as if same were fully set forth herein.

97. Defendant owed a duty to Plaintiffs and Class members to exercise reasonable care in the collection, storage, transmission, use, and protection of their Private Information, including a duty to implement and maintain cybersecurity safeguards reasonably adequate to prevent unauthorized acquisition, access, use, and disclosure of that information.

98. Defendant's duty arose from its voluntary undertaking to collect and store sensitive Private Information for its own benefit, from the special relationship between Defendant and patients, and from Defendant's knowledge of the sensitivity of the information and the foreseeable harm that would result from its disclosure.

99. Defendant's duty was informed by, among other things, sector-specific cybersecurity guidance applicable to healthcare providers, including HIPAA Security Rule requirements regarding administrative, physical, and technical safeguards;[34] guidance from the United States Department of Health and Human Services' Office for Civil Rights;[35] the NIST Cybersecurity Framework and related publications;[36] the CIS Critical Security Controls;[37] and the Federal Trade Commission's longstanding guidance on reasonable data security practices.[38] These authorities are cited as evidence of the standard of care applicable to organizations like Defendant;

[34] 45 C.F.R. §§ 164.302–318.
[35] U.S. Dep't of Health & Human Servs., Off. for Civil Rights, *Fact Sheet: Ransomware and HIPAA* (Sept. 20, 2021), https://www.hhs.gov/hipaa/for-professionals/security/guidance/cybersecurity/ransomware-fact-sheet/index.html (last visited June 4, 2026).
[36] NIST SP 800-53, Rev. 5.
[37] CIS Critical Security Controls v8.1.
[38] FTC, *Start with Security: A Guide for Business* (June 2015).

Plaintiffs do not assert any private cause of action under HIPAA or under the FTC Act.

100. Defendant breached its duty to Plaintiffs and Class members by, among other things: failing to implement reasonable administrative, physical, and technical safeguards; failing to implement and enforce strong access controls and multi-factor authentication; failing to encrypt sensitive Private Information at rest, or failing to do so in a manner that effectively prevented unauthorized acquisition; failing to maintain and enforce a written information security program reasonably designed to protect the confidentiality, integrity, and availability of Private Information; failing to maintain network segmentation between sensitive clinical and administrative systems and externally accessible systems; failing to implement adequate logging, monitoring, and detection capabilities; failing to maintain and test data backups in a manner that mitigated the consequences of a security incident; failing to conduct adequate periodic risk assessments; failing to provide adequate cybersecurity awareness training to its workforce; failing to maintain and test a written incident response plan; failing to apply security patches in a timely manner; and failing to retain and oversee qualified cybersecurity personnel and outside vendors.

101. It was reasonably foreseeable to Defendant that a failure to implement reasonable cybersecurity controls would result in unauthorized acquisition, access, use, and disclosure of Plaintiffs' and Class members' Private Information, and that such unauthorized acquisition, access, use, and disclosure would cause concrete and ascertainable harm to Plaintiffs and Class members.

102. As a direct and proximate result of Defendant's breaches of duty, Plaintiffs and Class members have suffered, and will continue to suffer, injury and damages as alleged in detail above, including, without limitation: a substantially increased and certainly impending risk of identity theft, financial fraud, and medical identity theft; lost time and out-of-pocket expenses incurred to mitigate and remediate the consequences of the Data Breach; the diminished value of

their Private Information; loss of privacy and confidentiality; emotional distress; and the deprivation of the benefit of the bargain in their commercial relationship with Defendant.

103. Plaintiffs and Class members are entitled to recover compensatory damages, equitable and injunctive relief, attorneys' fees and costs as allowed by law, and such other and further relief as the Court deems just and proper.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiffs and the Class)**

104. Plaintiffs reallege paragraphs 1 through 95 as if same were fully set forth herein.

105. Plaintiffs and Class Members provided their Private Information to Defendant, directly or indirectly, in order to obtain Defendant's services, and Defendant solicited and accepted that Private Information for the purpose of providing those services.

106. In providing their Private Information and paying for services, directly or indirectly, Plaintiffs and Class Members entered into implied contracts with Defendant under which Defendant agreed to safeguard their Private Information using reasonable data security measures and to notify them promptly in the event of a breach.

107. The provision of reasonable data security was part of the consideration for the parties' relationship, and a portion of the amounts paid to Defendant or its providers was understood to be allocated to securing Private Information.

108. Plaintiffs and Class Members would not have provided their Private Information to Defendant, or would not have done so on the same terms, had they known Defendant did not maintain reasonable data security.

109. Plaintiffs and Class Members performed their obligations under the implied contracts.

110. Defendant breached the implied contracts by failing to safeguard Plaintiffs' and

Class Members' Private Information with reasonable data security measures and by failing to provide them with timely and accurate notice of the Data Breach.

111. As a direct and proximate result of Defendant's breach of the implied contracts, Plaintiffs and Class Members have suffered injury and damages, including foreseeable consequential damages, in amounts to be proven at trial.

**COUNT III**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Class)**

112. Plaintiffs reallege paragraphs 1 through 95 as if same were fully set forth herein.

113. This Count is pleaded in the alternative to Plaintiffs' claim for breach of implied contract.

114. Plaintiffs and Class Members conferred a monetary benefit on Defendant by providing their Private Information and by paying, directly or indirectly, for Defendant's services, a portion of which was to be used to provide reasonable data security.

115. Defendant knew of and appreciated the benefit conferred upon it and accepted and retained that benefit.

116. Defendant enriched itself by saving costs it should have expended to provide reasonable data security, while failing to provide the security for which Plaintiffs and Class Members paid, directly or indirectly.

117. Under principles of equity and good conscience, Defendant should not be permitted to retain the benefit it received, because it failed to implement the reasonable data security measures that were part of the consideration for that benefit and that would have prevented or mitigated the Data Breach.

118. As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members are entitled to restitution and to disgorgement of the benefits unjustly retained by

Defendant, including through the imposition of a constructive trust or the payment of restitution into a common fund.

119. Defendant should be required to disgorge the benefits unjustly retained, and Plaintiffs and Class members are entitled to restitution and such other and further relief as the Court deems just and proper.

**COUNT IV**
**DECLARATORY JUDGMENT**
**(On Behalf of Plaintiffs and the Class)**

120. Plaintiffs reallege paragraphs 1 through 95 as if same were fully set forth herein.

121. This count is brought under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

122. An actual controversy exists between Plaintiffs and the Class, on the one hand, and Defendant, on the other, concerning whether Defendant's data security measures are adequate to protect the Private Information that remains in its possession and whether Defendant has satisfied its duties to Plaintiffs and Class Members.

123. Upon information and belief, Defendant continues to possess the Private Information of Plaintiffs and Class Members and has not adequately remediated the deficiencies that permitted the Data Breach, leaving that information at continued risk.

124. Plaintiffs, on behalf of themselves and the Class, seek a declaration that Defendant's existing data security measures are inadequate and that Defendant must implement and maintain reasonable security measures, including: conducting regular security audits, penetration testing, and remediation; implementing adequate access controls, authentication, monitoring, and encryption; training personnel to identify and respond to security threats and phishing; and securely deleting Private Information no longer needed.

125. Plaintiffs and Class Members are entitled to corresponding injunctive relief to

protect their Private Information from further unauthorized access and disclosure.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of the other members of the Class proposed in this Complaint, respectfully request that the Court enter judgment in their favor and against ERMI, as follows:

(a) Certifying this action as a class action under Federal Rule of Civil Procedure 23, designating Plaintiffs as Class Representatives, and appointing Plaintiffs' undersigned counsel as Class Counsel;

(b) Awarding Plaintiffs and the Class compensatory damages in an amount to be proven at trial, including consequential damages, restitution, and disgorgement of unjust gains, as appropriate to each Cause of Action;

(c) Awarding Plaintiffs and the Class declaratory and injunctive relief, including an order requiring Defendant to: (i) implement and maintain reasonable cybersecurity safeguards consistent with applicable industry standards; (ii) provide adequate notice of the Data Breach to all affected individuals who have not yet received such notice; and (iii) provide credit monitoring, identity theft protection, and other appropriate remedial services to Plaintiffs and Class members for a period commensurate with the nature and duration of the risk created by the Data Breach;

(d) Awarding Plaintiffs and the Class pre-judgment and post-judgment interest at the maximum rates allowed by law;

(e) Awarding Plaintiffs and the Class their reasonable attorneys' fees, costs, and expenses to the extent allowed by law and equity; and

(f) Awarding Plaintiffs and the Class such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all appropriate issues raised in this Class Action Complaint.

Dated: June 5, 2026.

Respectfully submitted,

*/s/ Scott C. Harris*
Scott C. Harris
GA Bar No.: 101830
**BRYSON HARRIS SUCIU**
**& DEMAY, PLLC**
900 W. Morgan St.
Raleigh, NC 27603
Tel: 919-600-5003
Fax: 919-600-5035
sharris@brysonpllc.com

*Counsel for Plaintiffs and the Class*